[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-10730

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

VERTUIES WALL,
a.k.a. Vert,
LAWRENCE GRICE,
a.k.a. Lo Lo G,
LEWIS MOBLEY,
a.k.a. OG

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:16-cr-00145-TWT-JKL-7

—————————————

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and BRASHER,
Circuit Judges.

BRASHER, Circuit Judge:

This all-of-the-above criminal appeal of a three-defendant
trial involves several different issues related to the convictions and
sentences of members of the Gangster Disciples. Vertuies Wall,
Lawrence Grice, and Lewis Mobley were indicted in the same in-
dictment at issue in *United States v. Caldwell*, 81 F.4th 1160 (11th Cir.
2023), *cert. denied sub nom. Clayton v. United States*, 144 S. Ct. 870
(2024). But the cases were tried separately. In both cases, the dis-
trict court gave many of the same key jury instructions and used
the same key language in its verdict forms. Of import in this appeal,
Grice, Wall, and Mobley were all convicted of conspiracy under
the Racketeer Influenced and Corrupt Organizations Act, and
Grice was also convicted of a drug trafficking conspiracy charge.
Grice challenges the sufficiency of the evidence of his convictions.
And Wall and Mobley challenge various aspects of their convic-
tions and sentences. But they ultimately fail on each of the many

issues. Therefore, we affirm the defendants' convictions and sentences.[1]

## I.

About forty alleged members of the Gangster Disciples were indicted on various charges, namely conspiracy under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), and drug trafficking conspiracy charges, 21 U.S.C. § 846. Some individuals pleaded guilty, and others were found guilty. Three individuals, Lewis Mobley, Vertuies Wall, and Lawrence Grice ended up codefendants in one such case. The indictment provided notice that the government would seek to convict the individuals of the enhanced sentencing provision of 18 U.S.C. § 1963(a). Of particular note, the indictment cites all three Georgia murder-related statutes—the statutes criminalizing murder, attempted murder, and conspiracy to murder—in its list of racketeering acts for purposes of the RICO conspiracy charge but only the actual murder statute in the notice for the enhanced sentencing provision.

Before trial, the district court had to determine whether Mobley was competent to assist in his defense. A defense expert, Dr. Julie Dorney, testified that Mobley wasn't competent to stand trial. But Dorney conceded that Mobley was aware of the different pleas and plea bargains and the roles of different trial participants, that Mobley wasn't hearing voices at that time, and that Mobley had his condition under control via medication. Mobley refused to

---

[1] As to any issues not discussed, we summarily affirm.

see the government's expert psychologist, Dr. Scott Duncan, making it so that Duncan couldn't opine on Mobley's competence directly. But Duncan testified that an individual can be both "paranoid schizophrenic" and competent. He further explained that Mobley's prison records showed that Mobley had been very stable over the previous year and gave Mobley the lowest designation for mental health issues.

Duncan also testified that Mobley's conduct suggested "false or grossly exaggerated symptoms"—or malingering—particularly in light of Mobley's previous malingering diagnosis. For example, Mobley previously said that he did not want to be in a multi-defendant trial, giving him a reason to feign incompetency. And a prison guard testified that, after Mobley refused to meet with Duncan, Mobley said that "he didn't want to see the person to be made competent." The government also introduced recordings of calls that Mobley made from prison within days of Dorney's May interview finding him incompetent in which Mobley asked someone to send certain information to his attorneys and laughed and made plans.

Ultimately, the district court found Mobley competent. The district court noted that it had conducted a colloquy with Mobley several months before the competency hearing, and he had understood the charges against him and what was going on.

The trial was five weeks long and included testimony from more than sixty witnesses, establishing that the Gangster Disciples was a racketeering enterprise and that the defendants conspired to

participate in that enterprise through a pattern of racketeering activity that included murder and drug trafficking. The trial evidence included intercepted calls and detailed testimony from twelve Gangster Disciples members describing the gang's highly sophisticated organization and rules and specifying the violent, criminal conduct of numerous Gangster Disciples members, including Gangster Disciples leaders Mobley and Wall. Several Gangster Disciples witnesses testified that they had pleaded guilty in this case or to the RICO conspiracy. And there was some testimony about the convictions of other coconspirators. There was also significant incriminating physical evidence, such as gang literature, drugs, and firearms—including the firearm that Wall used in murders that took place at the Wings Cafe. Some of this physical evidence was recovered from Mobley's residence. Moreover, the trial evidence included surveillance video of both Mobley and Wall participating in attempted murder and murder, respectively.

Witnesses' testimony and gang literature established that murder was a feature of the Gangster Disciples and was directed by gang leadership—not mere random violence. For example, the gang's rules include a list of death violations, which are infractions punishable by death. Witnesses testified that there were special units of the gang charged with committing murder on gang leadership's orders.

The evidence connected Mobley and Wall to the gang's murders from their positions as gang leaders. For example, Mobley headed the Hate Committee, which enforced gang rules and

committed murders in Georgia. Mobley ordered the Hate Committee to kill J.H. As for Wall, the evidence showed that he was also a leader of the gang and used his leadership position to incite the gunfight at Wings Cafe, which ended in the murder of three people. Witnesses testified that Wall went to the Wings Cafe seeking a deadly confrontation with his victims and that he instigated the shootings.

Moreover, witnesses testified about the Gangster Disciples drug trafficking scheme and specified that the gang trafficked kilograms of cocaine. Gang literature discussed cocaine trafficking and how to do it effectively. Junior members were trained on drug trafficking, and gang leadership organized drug trafficking across state lines. Furthermore, cocaine and drug trafficking paraphernalia were seized from Mobley's residence during a search. Law enforcement agents testified about many of these facts based on their investigation.

Witnesses also testified that Grice was a Gangster Disciples leader in the Houston area. The jury heard evidence that Grice personally participated in Gangster Disciples management and in packaging a large Louisiana cocaine shipment. Other witnesses testified that Grice was involved in cocaine and heroin trafficking, and cell phone records established that Grice was in a car following the Louisiana cocaine shipment and made thirty-eight calls from nearby the Louisiana traffic stop that caught the drug shipment right after the stop happened.

At one point during trial, after the government introduced calls between coconspirators, Mobley—over the government's objection—elicited testimony that the defense didn't have the same opportunity to put "calls" before the jury. Mobley then later unsuccessfully tried to introduce evidence of a call. Consequently, the district court instructed the jury on the hearsay rule and the coconspirator exception, explaining that the defense may not use the coconspirator exception but may use other exceptions to the hearsay rule.

The district court also instructed that the evidence of guilty pleas and convictions was admitted for the limited purpose of explaining why certain individuals weren't part of the trial and directed the jury that it could not consider that evidence "in deciding the guilt or innocence of the defendants here on trial."

At the end of evidence, the district court instructed the jury on the relevant charges. The court explained to the jury during trial and in the final charge that it was the jury's responsibility to determine that a conspiracy existed before it could consider coconspirator statements. And the court instructed that the jury "shouldn't assume from anything I've said that I have any opinion about any factual issue in this case" and that the jury had to "arriv[e] at [its] own decision about the facts."

There was a dispute below about the mens rea. Mobley proposed an instruction that would have instructed the jury that he had to have knowledge that a coconspirator would commit racketeering acts. But then Mobley seemingly changed his position after

arguing for the knowledge language. In Mobley's objections to the jury instructions, which Wall adopted, he argued that the "knowing" language in the enhanced sentencing element was "an incorrect statement of the law." Mobley proposed that the instruction be changed to "charge the jury that the defendant joined or remained in the conspiracy knowing, intending[,] and agreeing that the enterprise engaged in this type of racketeering activity." Before the jury was instructed, Mobley and Wall again asserted that the sentencing element jury instruction stated "the incorrect standard." Again, counsel told the district court that "it has to be [] knowing, intending, and agreeing that the enterprise engaged in this type of activity." Ultimately, the district court instructed the jury that "[f]or those racketeering activity types, you must unanimously decide whether the Defendant joined or remained in the RICO conspiracy knowing that the enterprise engaged in this type of racketeering activity."

In its narration of what counts as a "pattern of racketeering activity," the district court defined "acts involving murder" broadly to "include[] murder, attempted murder, and/or conspiracy to murder." Dist. Ct. Doc. 2905 at 17. In this context, the district court explained the difference between murder—both standard murder with its requirement of malice aforethought and felony murder—and an inchoate crime like conspiracy to commit murder.

The jury verdict form for each defendant contained the relevant charges. Importantly, the special verdict form asked whether

the conspiracy "involve[d] murder" for purposes of the enhanced sentencing provision of 18 U.S.C. § 1963(a).

Grice was convicted of RICO conspiracy in violation of 18 U.S.C. § 1962(d) and drug trafficking conspiracy in violation of 21 U.S.C. § 846.

The jury found Mobley and Wall guilty of RICO conspiracy and found by special verdict for each defendant that the RICO conspiracy "involve[d] murder." For Mobley, the jury also found that the RICO conspiracy involved at least five kilograms of a mixture containing cocaine.

The jury also found Mobley guilty of committing a violent crime in aid of a racketeering activity (VICAR)—specifically VICAR attempted murder in violation of 18 U.S.C. § 1959(a)(5)—and of using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c) (Count 3).

And the jury found Mobley guilty of possessing cocaine with intent to distribute it based on a small quantity of cocaine found at his residence during the execution of a search warrant (Count 4) and a related firearms offense under 18 U.S.C. § 924(c) (Count 5). After trial, Mobley renewed a motion for acquittal on Counts 4 and 5 and on the drug quantity special verdict for the RICO conspiracy conviction. The court granted the acquittal motion as to Counts 4 and 5 but upheld the drug quantity special verdict. In upholding the drug quantity finding, the district court relied on a Gangster Disciples cooperator's testimony that historically the Gangster Disciples trafficked in multiple kilograms of cocaine, the cocaine recovered

from the residences of Gangster Disciples coconspirators, and the evidence that Grice was trafficking twenty kilograms of cocaine.

At issue in this appeal, Mobley and Wall received sentences for their RICO conspiracy counts based on the enhanced statutory maximum provision over objections raised at sentencing. The district court sentenced Mobley to 360 months of imprisonment on the RICO conspiracy count, a concurrent 120-month term for the VICAR attempted murder conviction, and a mandatory consecutive 120-month term on the Count 3 section 924(c) offense, for a total sentence of 480 months. The district court stated that it would give Mobley the same 480-month sentence even if the RICO conspiracy conviction were invalidated. The district court sentenced Wall to 360 months of imprisonment for the RICO conspiracy.

The defendants appealed. Grice challenges the sufficiency of the evidence for his convictions. Mobley and Wall challenge various aspects of their convictions and challenge receiving the enhanced statutory maximum sentences.

## II.

We must apply several standards of review to the issues in this appeal.

"We review a district court's determination of 'competency to stand trial as a factfinding subject to reversal only for clear error.'" *United States v. Saingerard*, 621 F.3d 1341, 1343 (11th Cir. 2010) (quoting *United States v. Izquierdo*, 448 F.3d 1269, 1276 (11th Cir. 2006)). "Where there are two permissible views of the evidence,

the factfinder's choice between them cannot be clearly erroneous." *Id.* (quoting *Izquierdo*, 448 F.3d at 1278).

We review several of the challenged decisions *de novo*. "We review a denial of a motion for judgment of acquittal *de novo*." *United States v. Maurya*, 25 F.4th 829, 841 (11th Cir. 2022) (emphasis added) (citing *United States v. Broughton*, 689 F.3d 1260, 1276 (11th Cir. 2012)). "The evidence is sufficient if, taking it in the light most favorable to the government [and drawing all reasonable inferences in the government's favor], 'a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.'" *Id.* (quoting *Broughton*, 689 F.3d at 1276); *United States v. Spradlen*, 662 F.2d 724, 727 (11th Cir. 1981). This standard is the same for a sufficiency of the evidence challenge to a statute's enhanced sentencing provision. And we also "review challenges to the constitutionality of a sentence *de novo*." *United States v. Flanders*, 752 F.3d 1317, 1342 (11th Cir. 2014) (quoting *United States v. Sanchez*, 586 F.3d 918, 932 (11th Cir. 2009)).

We can apply harmless error principles to most sentencing issues, including constitutional violations under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *See United States v. Candelario*, 240 F.3d 1300, 1307 (11th Cir. 2001) (quoting *Neder v. United States*, 527 U.S. 1, 7 (1999)). And we review the record *de novo* in performing harmless error review. *See United States v. Hands*, 184 F.3d 1322, 1330 n.23 (11th Cir.), (quoting *United States v. Scroger*, 98 F.3d 1256, 1261 (10th Cir. 1996), *modified on other grounds by*, 194 F.3d 1186 (11th Cir. 1999).

What's more, we review the cumulative effect of trial errors *de novo*. *See United States v. Pendergrass*, 995 F.3d 858, 881 (11th Cir. 2021) (citing *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007)). And we interpret statutes *de novo*. *See United States v. Rojas*, 718 F.3d 1317, 1319 (11th Cir. 2013) (citing *United States v. Murrell*, 368 F.3d 1283, 1285 (11th Cir. 2004)).

We also review several of the challenged decisions for an abuse of discretion. "We review a court's refusal to instruct the jury on a lesser included offense for [an] abuse of discretion." *United States v. Nguyen*, 255 F.3d 1335, 1340 (11th Cir. 2001) (citing *United States v. Cornillie*, 92 F.3d 1108, 1109 (11th Cir. 1996)). And we review a judge's determination that relevant evidence is admissible, rather than excludable under Federal Rule of Evidence 403, for an abuse of discretion. *See United States v. Eason*, 920 F.2d 731, 734 (11th Cir. 1990) (citing *United States v. Griffin*, 778 F.2d 707, 709 (11th Cir. 1985)). We likewise review for an abuse of discretion a district court's decisions about the admissibility of testimony. *See United States v. Hawkins*, 934 F.3d 1251, 1264 (11th Cir. 2019) (citing *United States v. Emmanuel*, 565 F.3d 1324, 1335 (11th Cir. 2009)).

Finally, we review most challenges that are raised for the first time on appeal for plain error. *See United States v. Gresham*, 325 F.3d 1262, 1265 (11th Cir. 2003).

## III.

### *A.*

We will start with Mobley's competency to stand trial. The district court found that Mobley had schizophrenia but was still competent to stand trial and assist with his defense. There was significant evidence of Mobley's schizophrenia. Indeed, the district court deferred to Mobley's medical diagnosis, finding that Mobley was "suffering from a mental disease or defect, that is, paranoid schizophrenia and/or antisocial personality disorder"—although the court noted serious questions about that diagnosis given the evidence of malingering. Nonetheless, the court found Mobley was "able to understand the nature and consequences of the proceedings against him and to assist properly in his defense." We review this competency determination for clear error. *See Saingerard*, 621 F.3d at 1343 (quoting *Izquierdo*, 448 F.3d at 1276). As long as the district court chooses one permissible view of the evidence, we must affirm on this issue. *See id.* (quoting *Izquierdo*, 448 F.3d at 1278). Mobley cannot meet this high bar.

A defendant is incompetent "if 'there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.'" *Id.* (quoting 18 U.S.C. § 4241(a)) (citing *Dusky v. United States*, 362 U.S. 402 (1960)). "[O]dd behavior" and a "history of mental illness" don't "mandate a finding of incompetency." *Battle v. United States*,

419 F.3d 1292, 1299 (11th Cir. 2005); *see also id.* at 1299 n.9 ("[M]ental illness, as a matter of law, does not preclude a finding of competency to stand trial."). In short, Mobley could have a mental illness and still be competent to stand trial.

Applying the deferential standard of review, we cannot say the district court clearly erred. To be sure, a defense expert opined that Mobley wasn't competent to stand trial, and there is no direct opposing testimony that Mobley was competent. Nonetheless, there is circumstantial evidence that Mobley was competent. Because Mobley refused to see the government's expert psychologist, Dr. Duncan, Duncan couldn't opine on Mobley's competence directly. But Duncan testified that an individual can be "paranoid schizophrenic" and still be competent, and he testified that Mobley's prison records showed that he had been very stable over the previous year and gave him the lowest designation for mental health issues. Duncan also opined that Mobley's evaluation record raised concern that Mobley may be malingering—expressing false or grossly exaggerated symptoms. The testimony of a prison guard and prison recordings suggested that Mobley understood the proceedings and may have been exaggerating his symptoms. Finally, the district judge cited an in-person colloquy with Mobley, after which the district court believed that Mobley understood the charges and proceedings.

In conclusion, there is evidence that Mobley was competent. Mental illness alone isn't enough to be incompetent; the key is a defendant's ability to assist counsel and understand the charges. *See*

*Battle*, 419 F.3d at 1299 (quoting *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995)). Based on this record, we cannot second-guess the district court's assessment. Because we cannot hold that the district court clearly erred by choosing one permissible view of the facts, Mobley's competency argument must fail.

### B.

We turn now to Grice's appeal. Unlike the other defendants, Grice challenges the sufficiency of evidence for his convictions for RICO conspiracy (Count 1) and drug trafficking conspiracy (Count 24). He argues that the district court erred by denying his motion for judgment of acquittal because the government failed to prove each element of the two offenses beyond a reasonable doubt. The burden on this issue on appeal is on Grice, and he fails to sustain it because there is sufficient evidence to support Grice's convictions.

To establish a RICO conspiracy under 18 U.S.C. § 1962(d), the government must prove that the defendants "objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes." *United States v. Starrett*, 55 F.3d 1525, 1543 (11th Cir. 1995) (quoting *United States v. Russo*, 796 F.2d 1443, 1455 (11th Cir. 1986)) (citing *United States v. Gonzalez*, 921 F.2d 1530, 1540 (11th Cir. 1991); *United States v. Elliott*, 571 F.2d 880, 902 (5th Cir. 1978)). "Agreement to participate in a RICO conspiracy can be prove[n] in one of two ways": (1) "by showing an agreement on an overall objective" or (2) "by showing that a defendant

agreed personally to commit two predicate acts." *United States v. Abbell*, 271 F.3d 1286, 1299 (11th Cir. 2001) (citing *United States v. Church*, 955 F.2d 688, 694 (11th Cir.1992)). An agreement on an overall objective may be proven "by circumstantial evidence showing that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." *Starrett*, 55 F.3d at 1544 (quoting *Gonzalez*, 921 F.2d at 1540). "RICO conspiracy requires neither proof of the commission of an overt act nor proof of an agreement to commit individual predicate acts." *United States v. Green*, 981 F.3d 945, 952 (11th Cir. 2020) (citing *Starrett*, 55 F.3d at 1543; *United States v. Pepe*, 747 F.2d 632, 659 (11th Cir. 1984)).

To establish a drug trafficking conspiracy under 21 U.S.C. § 846, the government must prove (1) an agreement between two or more people to possess with intent to distribute at least five kilograms of cocaine, (2) that the defendant knew about the agreement, and (3) that the defendant voluntarily joined the agreement. *See United States v. Azmat*, 805 F.3d 1018, 1035 (11th Cir. 2015) (citing *United States v. Monroe*, 866 F.2d 1357, 1365 (11th Cir. 1989)). The existence of an agreement may "be prove[n] by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Mateos*, 623 F.3d 1350, 1362 (11th Cir. 2010) (quotation marks omitted) (quoting *United States v. Molina*, 443 F.3d 824, 828 (11th Cir.2006)). A drug trafficking conspiracy conviction will be upheld "if there is sufficient positive indication that an illegal agreement exists, or when the circumstances surrounding a person's presence at the scene of conspiratorial

activity are so obvious that knowledge of its character can fairly be attributed to him." *United States v. Figueroa*, 720 F.2d 1239, 1246 (11th Cir. 1983) (citations omitted).

Here, witnesses testified that Grice was a Gangster Disciples leader in the Houston area. The jury heard evidence that Grice personally participated in Gangster Disciples management and the packaging of the Louisiana cocaine shipment. Other witnesses testified that Grice was involved in cocaine and heroin trafficking, and cell phone records established that Grice was in a car following the Louisiana cocaine shipment and made thirty-eight calls right after the Louisiana traffic stop from nearby that stop. Thus, the record evidence, taken in the light most favorable to the government, supports both of Grice's convictions for conspiracy because "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Maurya*, 25 F.4th at 841 (quoting *Broughton*, 689 F.3d at 1276). There was sufficient evidence for both the RICO conspiracy and drug trafficking conspiracy charges. Grice is wrong that his convictions are based on only speculation.

*C.*

Next, we face the question whether the district court correctly subjected Mobley and Wall to an enhanced statutory maximum sentence for their racketeering conspiracy convictions or instead violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000), with the 360-month sentence. The general statutory maximum sentence under the Racketeer Influenced and Corrupt Organizations Act is twenty years. *See* 18 U.S.C. § 1963(a). But "[t]he Act provides for a

maximum sentence of life imprisonment instead of only [twenty] years if 'the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment.'" *Caldwell*, 81 F.4th at 1174 (quoting 18 U.S.C. § 1963(a)). Mobley and Wall received thirty years under this enhanced statutory maximum sentencing provision.

The defendants collectively bring four challenges.[2] First, the defendants contend that the jury instructions (by referencing "acts involving murder") and the verdict form (by asking whether the conspiracy "involve[d] murder") failed to limit the jury's special verdict finding to crimes that carry a life sentence like murder and instead expanded it to other crimes like attempted murder and conspiracy to murder. Second, the defendants argue that the jury instructions should have required the jury to find each defendant's agreement and intent that the enterprise engage in murder or drug trafficking of a large quantity of drugs. Third, Wall individually argues that the court should have given a lesser-included offense instruction. Fourth, Mobley separately brings a sufficiency of the evidence challenge to the enhanced sentencing provision, arguing that the evidence was insufficient for the jury to find that he knew the conspiracy involved murder or the trafficking of over five kilograms of a controlled substance.

---

[2] Because Grice brought only one challenge, discussion of the "defendants" throughout the remainder of the opinion's analysis refers to Mobley and Wall.

1.

Mobley and Wall first argue that the district court's jury instructions and the special verdict form on the enhanced sentencing provision were overbroad and violated their due process rights under the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment. Because *Apprendi* requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury[] and proved beyond a reasonable doubt," 530 U.S. at 490, the defendants argue that ambiguity in what the jury was asked to find means that they cannot be sentenced to more than twenty years in prison on their RICO conspiracy convictions. The argument goes that if the jury didn't find a section 1962(d) predicate for which the maximum penalty includes life imprisonment, section 1963(a) cannot be satisfied and their sentences beyond twenty years would violate *Apprendi*. Specifically, Mobley and Wall argue that the district court's jury instructions and special verdict form on the enhanced sentencing provision did not limit the jury's special finding to racketeering activities for which the maximum penalty is life imprisonment. Because the district court instructed the jury to consider whether the defendants had engaged in "acts involving murder"—which the district court defined to "include[] murder, attempted murder, and/or conspiracy to murder"—and the special verdict form contained the language "involve[d] murder," Mobley and Wall contend that this language invited the jury to consider inchoate crimes like attempted murder

and conspiracy to murder, which do not carry a life sentence under Georgia law.

The government argues that Mobley and Wall invited this error because their proposed jury instructions also contained the "involving murder" language. In a letter under Federal Rule of Appellate Procedure 28(j), the government argues that the defendants' challenge on this point is foreclosed by *Caldwell*.

We need not decide whether the defendants invited the error because their challenge is squarely foreclosed by *Caldwell*. In *Caldwell*, which involved a separate trial of some of Mobley and Wall's coconspirators, we rejected a challenge to section 1963(a) jury instructions and a jury verdict form with the same challenged language. *See* 81 F.4th at 1180–82. In doing so, we stated that this argument didn't even implicate *Apprendi* because it was about the district court's allegedly improper interpretation of the jury's findings instead of a factual finding by the district court that increased the statutory range for a defendant's sentence. *See id.* at 1181.

Wall and Mobley argue that *Caldwell* is distinguishable because the defendants there did not preserve the objection to the section 1963(a) instruction, but Wall and Mobley did. But the reasoning of *Caldwell* applies, especially because *Caldwell* doesn't tie the key reasoning on this issue to the plain error review standard. *See id.* at 1181–82. It wasn't a case in which we said that we couldn't find plain error because of its high standard; we simply found no error.

Mobley and Wall concede that the verdict form language in *Caldwell* is "identical" to the instructions here. In both cases, the jury verdict form asked the jury to find whether the conspiracy "involve[d] murder." *Id.* at 1181 (alteration in original) (emphasis omitted). And indeed, the key jury instructions that allegedly led to error on this issue were also identical in *Caldwell* because in both cases the district court defined "acts involving murder" to "include[] murder, attempted murder, and/or conspiracy to murder." Dist. Ct. Doc. 2905 at 17; *see also Caldwell*, 81 F.4th at 1181.

We held in *Caldwell* that this exact language in the verdict form required the jury to find "that the conspiracy included actual, not inchoate, murder as part of its racketeering activities"; and we said that the district court defined "acts involving murder" in a different context such that there was no ambiguity in the instructions. 81 F.4th at 1181. Here, just as in *Caldwell*, the district court did not instruct the jury that it could use a finding of inchoate murder to satisfy the enhanced sentencing provision.

The district court defined "acts involving murder" broadly to include inchoate murder only in its narration of what counts as a "pattern of racketeering activity." That context was about finding at least two predicate acts for a RICO conspiracy conviction. *See id.* But just as in *Caldwell*, "the district court never said that the jury should read the phrase 'involve murder' to mean 'involve acts involving murder.'" *Id.* Indeed, just as in *Caldwell*, it is critical that "[t]he district court specifically defined 'murder' to include only actual murder under Georgia law, which is 'a racketeering activity for

which the maximum penalty includes life imprisonment.'" *Id.* (quoting 18 U.S.C. § 1963(a)) (citing Ga. Code § 16-5-1(e)(1)). And just as in *Caldwell*, "the verdict form asked whether the conspiracy 'involve[d] *murder*,' not 'acts involving murder.'" *Id.* (alteration in original). We held in *Caldwell* that "[t]he plain meaning of this phrase is that the question concerns what the district court defined as *murder*, not what the district court defined as *acts involving murder*." *Id.* Therefore, *Caldwell* decided the exact dispute at issue here. A close reading of the record combined with *Caldwell*'s reasoning establishes that there was no error. Mobley and Wall's first challenge to the enhanced sentencing provision fails.

### 2.

Mobley and Wall also argue that the jury instructions on the sentencing element were erroneous because the jury was not instructed to find that Mobley and Wall had the specific intent to assist in murder or large-scale drug trafficking. Instead, the district court instructed the jury that "[f]or those racketeering activity types, you must unanimously decide whether the Defendant joined or remained in the RICO conspiracy knowing that the enterprise engaged in this type of racketeering activity." Mobley and Wall contend that "knowledge" that the enterprise was engaged in murder and drug trafficking was insufficient and argue that, to authorize a higher statutory sentence consistent with *Apprendi*, the jury needed to find intent. Put differently, Mobley and Wall argue that the section 1963(a) sentencing element instruction language needed to mirror the substantive conspiracy element instruction.

The government responds that Mobley and Wall invited the error and waived or forfeited this challenge. And even if they can challenge the "knowing" language on appeal, the government contends there was no error.

Ultimately, even if Mobley and Wall didn't invite the error and the failure to instruct on intent were error, any error was harmless. Although a district court may not under *Apprendi* impose a statutorily enhanced sentence without a jury finding that is necessary to that sentence, "*Apprendi* errors do not fall within the limited class of 'fundamental constitutional errors that defy analysis by harmless error standards.'" *United States v. Candelario*, 240 F.3d 1300, 1307 (11th Cir. 2001) (internal quotation marks omitted) (quoting *Neder v. United States*, 527 U.S. 1, 7 (1999)). We have held that an *Apprendi* error is harmless when "it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Nealy*, 232 F.3d 825, 829 (11th Cir. 2000) (quoting *Neder*, 527 U.S. at 18). Applied to the enhanced sentencing provision, the error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the facts necessary for the enhanced sentencing provision to apply to the defendants, absent the alleged knowledge-versus-intent error.

The evidence here establishes that the Gangster Disciples enterprise included murder and that both Mobley and Wall entered into the RICO conspiracy and remained in it intending to commit murder. Many witnesses' testimony and gang literature established that murder was a key feature of the Gangster Disciples and was

directed by gang leadership; it wasn't just random violence. For ex-
ample, the rules of the gang include a list of death violations—in-
fractions punishable by death. Witnesses testified that there were
special units of the gang charged with committing murder on gang
leadership's orders.

And the evidence established beyond a reasonable doubt
that, as gang leaders, Mobley and Wall were part of the enterprise's
murders. For example, Mobley headed the Hate Committee,
which enforced gang rules and committed murders in Georgia.
Mobley ordered the Hate Committee to kill J.H. As the govern-
ment persuasively argues, Mobley's argument that he attempted
murder but did not know and intend for the conspiracy to com-
plete the crime of actual murder confounds logic. As for Wall, the
evidence established beyond a reasonable doubt that he was also a
leader of the gang and used his leadership position to incite the gun-
fight at Wings Cafe, which ended in the murder of three people.
Witnesses testified that Wall went to the Wings Cafe seeking a
deadly confrontation with his victims and that he instigated the
shootings. For both Mobley and Wall, the evidence established be-
yond a reasonable doubt that each intended to murder or intended
that others murder as part of the Gangster Disciples enterprise.

Furthermore, the evidence also established beyond a reason-
able doubt that Mobley joined and remained in the conspiracy
knowing and intending that the enterprise would engage in felony
drug trafficking sufficient for a life sentence. Witnesses testified
about the gang's drug trafficking scheme and specified that it

trafficked kilograms of cocaine. And the evidence showed that drug trafficking was pervasive through the gang. Gang literature discussed cocaine trafficking and how to do it effectively. Junior members were trained on drug trafficking, and gang leadership organized drug trafficking across state lines. Mobley was no exception: cocaine and drug trafficking paraphernalia was seized from Mobley's residence during a search. Mobley argues that this is not enough to establish that he knew about the gang's drug trafficking in quantities exceeding five kilograms and that he did not agree to participate in the conspiracy as to drug trafficking. But because the evidence established that there was cocaine and drug trafficking paraphernalia in Mobley's house—even if the district court tossed the possession count—that Mobley was a gang leader, and that even low-level members of the gang were aware of the large-scale drug trafficking enterprise, the evidence established beyond a reasonable doubt that Mobley joined and remained in the conspiracy intending to commit drug trafficking that supported a life sentence in furtherance of the Gangster Disciples enterprise.

Because "it is clear beyond a reasonable doubt that a rational jury would have found," absent the alleged knowledge-versus-intent error, that Mobley and Wall had committed a predicate racketeering act that could receive a life sentence as part of their respective RICO conspiracy convictions, any error was harmless—not reversible error. *Nealy*, 232 F.3d at 829 (quoting *Neder*, 527 U.S. at 18).

3.

Next, Wall argues that the district court erred by not granting his request to include voluntary manslaughter as a defense to the murder finding in the special verdict form. He argues that the evidence supported a voluntary manslaughter defense and that the jury could have found his participation in the conspiracy involved manslaughter, not murder, which would make him ineligible for a sentence over twenty years. The government argues that lesser-included-offense instructions are not applicable in the context of a RICO conspiracy. The government's argument is better.

We have already considered whether a district court is obligated to instruct a jury on the lesser included offenses of a predicate act as part of the guilt instructions for a RICO conspiracy. *See United States v. Nguyen*, 255 F.3d 1335, 1339–40 (11th Cir. 2001). We have explained that "the purpose of a lesser included offense instruction is to afford the defendant the opportunity to be found guilty of a crime that carries a lesser sentence than the charged offense." *Id.* at 1340 (citing *United States v. Forsythe*, 594 F.2d 947, 952 (3d Cir. 1979)). Because a defendant "cannot be convicted of either the state law felonies alleged as predicate acts or the lesser included offenses of those felonies when he is tried for a RICO violation in federal court," we held that instructions on lesser included offenses were not required. *Id.* (citing *Forsythe*, 594 F.2d at 952).

The government argues that the reasoning in *Nguyen* "applies equally to the murder special verdict." Wall responds that *Nguyen* does not foreclose his argument because instructing the

jury on lesser included offenses in the sentencing element is not the same as instructing the jury on the lesser included offenses as part of the guilt finding for the conspiracy. Wall is wrong. Although *Nguyen* did not address whether courts must instruct on lesser included offenses as part of the sentencing element of section 1963(a), *Nguyen*'s reasoning applies. A RICO conspiracy based on murder "is not simply a federalized version of the state crime" of murder but "a distinct substantive offense that requires proof of its own particular elements." *United States v. Diaz*, 176 F.3d 52, 101 (2d Cir. 1999). To prevail on the sentencing element of section 1963(a), the government must prove that the elements of another criminal offense that carries a life sentence were satisfied. *See United States v. Simmons*, 11 F.4th 239, 259 (4th Cir. 2021).

So for the jury to find that Wall was eligible for a sentence over twenty years, the government had to prove that the conspiracy involved an offense that carries a life sentence—not a lesser offense like negligent homicide or voluntary manslaughter. *See* 18 U.S.C. § 1961(1) (defining "racketeering activity" to include murder but not lesser offenses of murder). The jury was instructed on murder and the requirement of malice aforethought and was instructed on felony murder. Thus, the jury was properly instructed on an offense that carries a life sentence and ultimately found that the enhanced sentencing element's facts were met. The jury wasn't instructed on voluntary manslaughter—which, by contrast, wasn't a valid predicate offense for the enhanced sentencing element. But the jury need not be instructed on every crime. Indeed, a district court is not required to "charge respecting an offense of which the

defendant could not be found guilty." *Nguyen*, 255 F.3d at 1340 (quoting *Forsythe*, 594 F.2d at 952). And just as in the context of guilt for the RICO conspiracy itself, because a defendant "cannot be convicted of [] the state law felonies alleged as predicate acts or the lesser included offenses of those felonies when he is tried [and sentenced] for a RICO violation in federal court," instructions on lesser included offenses were not required. *Id*. Therefore, Wall's argument fails. The district court didn't abuse its discretion by refusing to give the lesser-included-offense instruction.

### 4.

In the final sentence-related challenge, Mobley challenges the sufficiency of the evidence supporting the finding that the enhanced sentencing provision applies to him.[3] Mobley argues that the evidence was insufficient for the jury to find that he knew that the conspiracy involved actual murders or the trafficking of over five kilograms of a controlled substance. Mobley argues that the evidence only supported a finding that he committed attempted murder but cannot support a finding that he knew about any actual murder committed by the conspiracy. The government argues that the evidence overwhelmingly showed that Mobley was a leader of the racketeering conspiracy and knew, intended, and agreed that

---

[3] Only Mobley brings this challenge. Wall merely states that the evidence isn't too strong but doesn't so much as say he is making a sufficiency of the evidence challenge. If he tried to do so, he forfeited it due to insufficient briefing.

murder was a core part of the Gangster Disciples. We agree with
the government.

In reviewing the sufficiency of the evidence, "we 'view the
evidence in the light most favorable to the verdict and draw all rea-
sonable inferences and credibility choices in the verdict's favor.'"
*United States v. Iriele*, 977 F.3d 1155, 1168 (11th Cir. 2020) (altera-
tions accepted) (quoting *United States v. Godwin*, 765 F.3d 1306,
1319 (11th Cir. 2014)). "A guilty verdict 'cannot be overturned if
any reasonable construction of the evidence would have allowed
the jury to find the defendant guilty beyond a reasonable doubt.'"
*Id.* (quoting *United States v. Rodriguez*, 732 F.3d 1299, 1303 (11th Cir.
2013).

The evidence discussed above supporting the harmless error
analysis of the knowledge-versus-intent sentencing issue also de-
feats Mobley's sufficiency of the evidence challenge. The evidence
here was sufficient to show that the Gangster Disciples enterprise
included murder. A reasonable construction of the evidence would
allow the jury to conclude that Mobley knew and agreed that ac-
tual murder was part of the Gangster Disciples enterprise. Moreo-
ver, based on the facts discussed in the harmless error analysis
above, it is clear that the evidence was also sufficient to allow a jury
to reasonably conclude that Mobley joined and remained in the
conspiracy knowing and agreeing that the enterprise engaged in
felony drug trafficking sufficient for a life sentence. And frankly,
there was sufficient evidence that Mobley intended both of these

ends of the RICO conspiracy too. Therefore, Mobley's sufficiency of the evidence challenge to the enhanced sentencing element fails.

*D.*

Next, Mobley and Wall challenge the government's introduction of testimony about the convictions of non-testifying co-conspirators. They challenge the admission on both a non-constitutional ground that was raised below and a constitutional ground that wasn't raised below. Both challenges fail.

We turn first to the admissibility of the testimony under Federal Rule of Evidence 403. We have held that "[a] co-defendant's guilty plea may not be used as substantive evidence of the defendant's guilt." *United States v. McLain*, 823 F.2d 1457, 1465 (11th Cir. 1987), *overruled on other grounds by United States v. Watson*, 866 F.2d 381 (11th Cir. 1989). Thus, courts must be careful with such evidence generally. We have also held that "the admission of guilty pleas or convictions of codefendants or coconspirators not subject to cross-examination is generally considered plain error." *Eason*, 920 F.2d at 734 (citing *McLain*, 823 F.2d at 1465). And we have noted that "[t]he prejudice incurred by admission of a conviction may be even greater than that incurred by admission of a guilty plea because of the persuasiveness of the judgment of another group of unbiased fact-finders." *Id.* at 734 n.2. We have identified two exceptions that don't apply here: (1) where codefendants plead guilty in the middle of trial and disappear from the courtroom, "the trial court may comment that codefendants have been excused from trial for legally sufficient reasons that should have no bearing

on the remaining defendants' guilt or innocence"; and (2) "where a codefendant takes the witness stand, evidence of a guilty plea may be introduced to aid the jury in assessing the codefendant's credibility." *Id.* at 734 n.3 (quoting *Griffin*, 778 F.2d at 710 n.5).

Here, the district court instructed that the evidence of guilty pleas and convictions was admitted for the limited purpose of explaining why certain individuals were not part of the trial and directed the jury that it could not consider that evidence in deciding the guilt or innocence of the defendants. Any error from the admission of this evidence, however, was harmless because it was merely cumulative. Several Gangster Disciples witnesses testified that they had pleaded guilty in this case or to the RICO conspiracy. The fact that these testifying coconspirators had sustained convictions was permissibly before the jury to help it evaluate credibility. *See Griffin*, 778 F.2d at 710 n.5 ("[W]here a codefendant takes the witness stand, evidence of a guilty plea may be introduced to aid the jury in assessing the codefendant's credibility." (citing *United States v. Baez*, 703 F.2d 453, 455 (10th Cir. 1983))). The knowledge that a few more people had been convicted would not have appreciably changed the jury's assessment of the evidence. The introduction of the convictions and guilty pleas here were, therefore, "merely cumulative," and thus harmless. *United States v. Emmanuel*, 565 F.3d 1324, 1336 (11th Cir. 2009).

Next, we turn to the defendants' summary Sixth Amendment claim on this issue. This claim wasn't preserved because the defendants objected below only on the grounds that the evidence

was irrelevant and prejudicial. Thus, we review this Sixth Amendment claim for plain error. There are four elements to the plain-error test: "there must be (1) an error (2) that is plain and (3) that has affected the defendant's substantial rights"; and if the first three elements are met, "then a court may exercise its discretion to correct the error if (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Moore*, 22 F.4th 1258, 1264–65 (11th Cir. 2022) (quoting *United States v. Madden*, 733 F.3d 1314, 1320 (11th Cir. 2013)).

Our case law states that "[t]he traditional standard for admission of a co-defendant's guilty plea comes under Fed[eral] R[ule] [of] Evid[ence] 403." *McLain*, 823 F.2d at 1465 (citing *Griffin*, 778 F.2d at 709). Our case law doesn't state that admission of a codefendant's guilty plea under Rule 403 can nonetheless give rise to a constitutional problem under the Sixth Amendment. And even if it had been a Rules-based error, not all error rises to the level of constitutional error; and our case law doesn't plainly establish that this would be one even if it were a Rule 403 error. *See United States v. Akwuba*, 7 F.4th 1299, 1311 (11th Cir. 2021). Given this case law, we cannot say that any error was plain even if this were a Sixth Amendment error.

*E.*

Additionally, the district court made references to coconspirators to the jury that the defendants argue were tantamount to a directed verdict in this conspiracy case. The defendants are

wrong. To start, the defendants didn't object to this at trial; so we review this issue for plain error.

"To rise to the level of a directed verdict—and constitute constitutional error—the trial judge's statements, viewed as a whole, must amount to an intervention which could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor." *Id.* (cleaned up). But while a district court judge "has no power to direct a verdict of guilty," he "has a wide latitude in commenting on the evidence during his instructions to the jury." *Id.* (quoting *Mims v. United States*, 375 F.2d 135, 148 (5th Cir. 1967)).

After the government introduced calls between coconspirators at trial, Mobley—over the government's objection—elicited testimony that the defense didn't have the same opportunity to put "calls" before the jury. Mobley then later unsuccessfully tried to introduce evidence of a call. Because the implication of these defense actions to the jury was that information was being kept from the jury, the district court instructed the jury on the hearsay rule and the coconspirator exception and explained that the defense may not use the coconspirator exception but may use other exceptions to the hearsay rule.

The mention of "coconspirators" in the context of explaining evidentiary rules to the jury is not error. It is merely explaining the law to the jury so that the jury can understand the proceedings and the evidence. The district court's use of the word "coconspirators" was well within its wide latitude to comment on the evidence

in instructing the jury. *See id.* On plain error review of this consti-tutional issue, we cannot say that the district court erred.

*F.*

Mobley and Wall next challenge the admission of certain opinion testimony. Relying on *United States v. Hawkins*, 934 F.3d 1251 (11th Cir. 2019), they argue that improper opinion testimony was admitted because the testimony included summaries of the ev-idence and speculation about ordinary language. This challenge fails.

In *Hawkins*, we held that an agent presented as an expert had given improper expert testimony when he interpreted and specu-lated about the meaning of unambiguous conversations as a whole. *See id.* at 1260–61. We held that the agent's presentation of sum-maries of the evidence in the context of an expert opinion was plain error. *See id.* at 1261 (holding that it was plain error to allow an expert agent's testimony when, "[d]uring his extensive time on the witness stand," the agent "interpreted unambiguous language, mixed expert opinion with fact testimony, [] synthesized the trial evidence for the jury," "strayed into speculation," and "went be-yond interpreting code words to interpret[ing] conversations as a whole" (citation and quotation marks omitted)).

But as the defendants acknowledge, *Hawkins* was about ex-pert testimony; and we have distinguished *Hawkins* outside that context. In *United States v. Pendergrass*, 995 F.3d 858 (11th Cir. 2021), we interpreted *Hawkins* in the face of a similar challenge to alleg-edly improper opinion and summary testimony. *See Pendergrass*,

995 F.3d at 880. We noted that "[i]n *Hawkins*, the government presented the agent there as an expert, but the agent also testified to matters of fact" such that the "agent's testimony crossed back and forth between factual testimony and expert opinion." *Id.* We also stated that "the *Hawkins* agent provided speculative interpretative commentary on the meanings of entire conversations, as opposed to construing just drug code words used during the conversations and for which he served as an expert." *Id.*

We held that the situation was distinguishable in *Pendergrass* because in *Pendergrass* "the government did not admit [the agent] as an expert, so no danger of confusion between factual and expert-opinion testimony existed." *Id.* at 880–81. The agent in *Pendergrass* "also did not purport to have expert knowledge of the subtext of entire conversations consisting of everyday language, like the agent in *Hawkins* did." *Id.* at 881. Instead, the *Pendergrass* agent "simply reviewed the evidence presented, explaining to the jury how he linked Pendergrass to the robberies" at issue in that case. *Id.* "And significantly, [the agent's] testimony was supported by surveillance videos, still pictures, tangible evidence found at Pendergrass's home, ballistics, cell-site data, and other witness testimony." *Id.* We held that instead of "involv[ing] improper interpretation of evidence that impeded or invaded the function of the jury," *Pendergrass* "involve[d] the synthesis of a large volume of already-admitted evidence." *Id.* There was nothing wrong with such synthesis.

Moreover, "even assuming some of [the agent's] testimony strayed into the realm of improper interpretation," we held that

this wasn't a problem because the agent "was neither the sole nor the primary witness in the case," which we concluded "distinguishe[d] [*Pendergrass*] . . . from *Hawkins* in yet another way." *Id.* Unlike *Hawkins* in which "the agent [] testified for more than half the trial," in *Pendergrass* "the government presented twenty-seven witnesses at trial over five days, and many witnesses testified to the same facts that [the agent] did." *Id.*

This case is like *Pendergrass*, not *Hawkins*. Here, the case agents whose testimony is challenged were not qualified as experts, "so no danger of confusion between factual and expert-opinion testimony existed." *Pendergrass*, 995 F.3d at 880–81. Moreover, contrary to defendants' argument, the bulk of the case agents' testimony was permissible factual or lay opinion testimony tied to the specifics of their investigation. A lay witness may offer an opinion that is (1) "rationally based on the witness's perception," (2) helpful to the jury, and (3) not founded on scientific or expert knowledge within the scope of Federal Rule of Evidence 702. Fed. R. Evid. 701. A lay witness also may offer "opinion testimony based on his professional experiences." *United States v. Williams*, 865 F.3d 1328, 1341 (11th Cir. 2017). For example, in *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011), we held that an agent's translation of "code words that he learned through his examination of voluminous documents" over the course of his investigation was permissible lay testimony. *Id.* at 1103.

Thus, the testimony the defendants challenge wasn't the kind of entire-trial-long, all-compassing evidence summary that the

expert in *Hawkins* presented. Instead, the evidence in this case was the typical factual testimony that a knowledgeable lay witness investigator may present at trial. This testimony was not admitted in error. The district court didn't abuse its discretion.

G.

Mobley raises two final challenges, raising a cumulative error challenge and separately arguing that the predicate crime used for his conviction for using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c) wasn't a crime of violence.

First, Mobley summarily raises a claim of cumulative error. "The cumulative-error doctrine calls for reversal of a conviction if, in total, the non-reversible errors result in a denial of the constitutional right to a fair trial." *Pendergrass*, 995 F.3d at 881 (citing *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014)). "We address claims of cumulative error by first considering the validity of each claim individually[] and then examining any errors that we find in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (citing *United States v. Calderon*, 127 F.3d 1314, 1333 (11th Cir. 1997)). "No cumulative error exists where a criminal defendant cannot establish that the combined errors affected his substantial rights." *Pendergrass*, 995 F.3d at 881 (citing *United States v. Foley*, 508 F.3d 627, 638 (11th Cir. 2007)). "A defendant's substantial rights are not affected if 'properly admitted evidence sufficiently established [his]

guilt.'" *Id.* (alteration in original) (quoting *United States v. Adams*, 74 F.3d 1093, 1100 (11th Cir. 1996)). Mobley's cumulative error claim related to his conviction fails because—even assuming the testimony that non-testifying coconspirators were convicted and pleaded guilty were error—a single harmless error cannot be cumulative error. Likewise, his cumulative error claim with respect to his sentence fails because—even assuming the enhanced sentencing provision issue resolved above on harmless error grounds were error—again, a single harmless error cannot be cumulative error.

Second, Mobley challenges his Count 3 conviction for using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c). Mobley argues that the predicate crime of violence—Mobley's Count 2 VICAR attempted murder conviction, which in turn is partially predicated on Georgia attempted murder—is not a valid crime of violence. But as Mobley concedes, *Alvarado-Linares v. United States*, 44 F.4th 1334 (11th Cir. 2022), forecloses his challenge. *See id.* at 1345–48 (providing that Georgia attempted murder is a crime of violence).

**IV.**

We **AFFIRM** the defendants' convictions and sentences.